GEORGE B. BEARCE, and another, *vs.* ANSEL DUDLEY, and others.

Androscoggin.     Opinion February 3, 1896.

*Timber.   Pulp-wood.   R. S., c. 42, § 6;   Stat. 1831, c. 521, § 7;   R. S., of U. S., §§ 2317, 2465, 2466.*

The cost of driving pulp-wood that has become so intermixed with logs that it cannot be conveniently separated may be recovered by the owner of the logs under R. S., c. 42, § 6.

The benefits of the statute are equally useful whether the drives are saw-logs, ship-timber, pulp-wood, or other wood-products suitable for commerce or manufacture that may be conveniently driven to market. The statute is remedial and should be construed liberally, when necessary to work out the purpose of the legislation.

Floatable streams are public, and being free to all, if their capacity for floating logs is inadequate to serve the purposes of all, each one must so conduct his drive as to give others a reasonable share of their benefits.

The defendants turned some of their pulp-logs into the river in advance of the plaintiff's drive and left them to make their own way down stream. The plaintiffs came along with their own drive of logs which intermixed with the defendants' so that separation was costly and vexatious. The plaintiffs drove the whole mass and brought their action, under the statute, to recover the cost of driving the defendants' pulp-wood. *Held;* that they could recover; and that it is no defense to say that it was of no benefit to the defendants, or that the plaintiffs had still another drive later when all of the defendants' logs would have been turned in.

*Held;* that the plaintiffs were required to drive only such of the defendants' logs at their expense as became so intermixed with plaintiffs' that they could not be conveniently separated; and were not required to make a clean drive of any other logs that had not interfered with their own.

*Also,* that when intermixed logs are once taken charge of to be driven at the expense of various owners, they must be driven clean; and the measure of damages is the pro rata expense of driving the mass.

ON REPORT.

This action was brought under R. S., c. 42, § 6, to recover compensation for driving a quantity of poplar pulp-logs which had become intermingled with the logs of the plaintiffs and which the plaintiffs drove from Rumford Falls down the Androscoggin river to Lewiston in the spring of 1894. The drive was composed of two lots of spruce logs belonging to the plaintiffs, one of which was from the boom at the head of Rumford

Falls, and one of which was from behind Lothrop's Island in
Jay; and of different lots of poplar pulp-logs belonging to the
defendants, from Bear river, Ellis river, Swift river, Webb
river, Seven-Mile brook, Twenty-Mile river, and different points
on the main river.

The plaintiffs introduced evidence showing that they started
their drive from Rumford Falls April 18th, taking not only
their own logs but all the poplar pulp-logs which were then
intermingled with their own logs, and all which, during its pas-
sage to Lewiston ran into and intermingled with the drive from
the rear drive, from streams tributary to the main river and
from landings on the main river. The drive arrived at Lewis-
ton, June 25. Its cost was $5554.88, and this suit was brought
to recover a reasonable compensation for the labor performed
and expense incurred on the defendants' logs.

(Declaration.) "In a plea of the case, for that the plaintiffs
on the twelfth day of April, 1894, at or near Rumford Falls on
the Androscoggin river in the town of Rumford and State of
Maine, were the owners and possessors of a large quantity of
logs and timber then and there being in the waters of said river
for the purpose of being floated and driven from said Rumford
Falls to their place of market or manufacture, to wit, to Lewis-
ton in said State of Maine; and the logs and timber of said
plaintiffs on said twelfth day of April, 1894, at said Rumford
became so intermixed with certain logs and timber of said
defendants then and there being in the waters of said Andro-
scoggin river and thereafterwards at divers other places between
said Rumford Falls and Lewiston with certain other logs and
timber of said defendants and all of said defendants' logs and
timber so intermixed consisting of poplar pulp-logs cut in
lengths of four feet, and amounting in all to twenty-two thous-
and cords, that the logs and timber of said plaintiffs could not
be conveniently separated for the purpose of being floated and
driven in the waters of said river to their place of market or
manufacture aforesaid, and so that said plaintiffs could drive
their own logs without said logs of said defendants; and there-
upon said plaintiffs, in accordance with the provisions of the

statute, in such cases made and provided, did then and there drive all of said defendants' logs and timber aforesaid with which their own logs and timber had become so intermixed from said Rumford to said Lewiston. And the plaintiffs aver that on the twelfth day of April, 1894, and at any other time during the progress of said drive from Rumford to Lewiston, no special and different provision existed or was made by law for driving said logs of said defendants.

"Whereupon, and by force of the statute in such case made and provided, the said plaintiffs became entitled to receive and recover from said defendants a reasonable compensation for so driving said defendants' logs, to be recovered after demand therefor.

"And the plaintiffs aver that they have demanded payment of said defendants who are the owners of said logs and timber so driven in the sum of thirty-five hundred dollars for driving the same as above set forth ; that said sum is a reasonable compensation therefor, and that said defendants did and still do neglect and refuse to pay the same or any part thereof.

"And the plaintiffs further aver that this action is brought to enforce the plaintiffs' lien upon the logs and lumber of the defendants to recover a reasonable compensation for driving the same from said Rumford to Lewiston, and that this action is brought within thirty days after said logs and timber arrived at said Lewiston, the place of destination of the plaintiffs' logs and timber, and within thirty days after the same arrived at Topsham, being the destination on the Androscoggin river of the logs and timber of said defendants."

*Wallace H. White and Seth M. Carter, Wm. H. Newell and W. B. Skelton*, for plaintiffs.

Counsel argued : (1.) That plaintiffs made this drive at a reasonable and proper time.

(2.) That the spruce logs of the plaintiffs and the poplar pulp-logs of the defendants were so intermingled that the same could not be conveniently separated for the purpose of being floated to market.

(3.) That no special and different provision was made by law for driving these logs.

(4.) That these plaintiffs made a reasonably clean drive of all the defendants' poplar pulp-logs which were intermingled with their own logs when the drive started, which ran into and intermingled with the rear of this drive on its passage from Rumford Falls to Lewiston, and which were afloat within the banks of the river or stranded on obstructions in the bed of the river or on the shores between Rumford Falls and Lewiston.

(5.) That from one-half to two-thirds in amount of the whole drive was poplar wood.

(6.) That at least one-half the expense of making the drive was incurred on account of work done on defendants' logs.

(7.) That the driving was prosecuted with reasonable diligence and in a skillful manner.

(8.) That the cost of the drive was $5554.88, one-half of which at least the plaintiffs are entitled to recover from these defendants.

(9.) That demand was made on the defendants before this suit was begun.

Counsel cited : *Sands* v. *Sands*, 74 Maine, 240 ; *Bondur* v. *LeBourne*, 79 Maine, 21 ; *Kallock* v. *Parcher*, 52 Wis. 393 ; *Osborne* v. *Nelson Lumber Co.* 33 Minn. 285 ; *Foster* v. *Cushing*, 35 Maine, 60 ; *Wisconsin, &c. Assoc.* v. *Comstock Log Co.* 72 Wis. 321 ; *Beard* v. *Clark*, 35 Minn. 328 ; *Miller* v. *Chatterton*, 46 Minn. 338.

*A. R. Savage and H. W. Oakes*, for defendants.

Poplar pulp-wood, cut into four-foot lengths to be ground into pulp, certainly lacks every idea which we ordinarily attach to the word "timber." When the statute was first enacted, clearly it did not apply to pulp-wood, because at that time there was none. The meaning and purpose of the statute had reference solely to trunks or stems of trees, generally as cut full length to be driven down our streams. Both the shingle rift and the railroad ties, mentioned in *Sands* v. *Sands,* 74 Maine, 240, come within the dictionary definition of timber —

materials for a structure.  Pulp-wood certainly does not.  To apply the statute to the driving of pulp-wood, and at the same time apply the rules of law which the court have heretofore formulated, to an action of this kind almost necessarily produces injustice.

When the statute was framed, the drives of timber were all of the same nature, and ordinarily with the same destination, and for the same use, and driven in the same manner, which is not true when we make a comparison between spruce timber and poplar pulp-wood.  If there ought to be a provision in the statute broad enough to cover a case of this kind, future legislatures can supply the want.  But we contend that, at the present time, the statute does not reach the case.  If, however, the court think differently, and that by any intendment the statute can be made to reach a changed condition of affairs, and changed kinds of timber, and driven in changed ways, we contend that the statute should be applied in such a way as to do no wrong and work no hardship.

At the time plaintiffs drove the drive in question, they knew it would be necessary for the defendants to drive independently later in the season over the same river the entire distance.  The plaintiffs claimed that they made a clean drive.  This defendants denied.

1.  If the plaintiffs did not drive clean they are not entitled to recover.  It is the duty of a party who seeks to recover under the statute to have made a reasonably clean drive, that is, as clean as the owner would ordinarily have driven them, so clean that another drive will not be necessary to secure the same wood.

2.  If it shall be found that the plaintiffs made a clean drive, it was solely for the advantage of the plaintiffs for a special purpose.  They had four million feet of logs, and they had hired a mill to saw that four million feet, no more, no less.  It was therefore necessary for them to take it all on that drive, because they did not have a mill for general purposes.  It was no advantage to the defendants, who must go over precisely the same ground again that year any way, which fact as we have

stated was known to the plaintiffs. This being so, we contend that the plaintiffs had no right to expend money in driving our wood clean except so far as necessary to drive their own timber clean, and that they have no right to charge us for that extra expense.

3. We contend that, if the plaintiffs are entitled to recover at all under the circumstances, it is only for the benefit which their drive was to the defendants, that is, the case must be decided on equitable principles ; or at the most, that they would be entitled only to so much additional expense as they were subjected to by reason of the fact that the defendants' wood was intermingled with their logs.

SITTING : PETERS, C. J., WALTON, FOSTER, HASKELL, WIS-WELL, STROUT, JJ.

HASKELL, J.   Case under R. S., c. 42, § 6, for driving pulp-wood intermixed with logs so that it could not be conveniently separated.

I. It is denied that the statute applies to pulp-wood. Its language is, "timber so intermixed with logs . . . that it cannot be conveniently separated." Its purpose was to comprise all products of the forest conveniently floatable to market. The statute was passed in 1831, c. 521, § 7. The language there used was "all logs or other timber." The words "all logs or other" have been dropped by revision without intent to change the meaning. These words indicate an intent to include not only logs but other wood-products, and the word timber there used and retained in the revision was intended to have a comprehensive meaning suited to the purpose of the statute.   In *United States* v. *Stores*, 14 Fed. Rep. 824, on an indictment for cutting "timber" upon the lands of the United States in violation of the act of March 2, 1831, that prohibits the cutting of "live-oak, red-cedar and other timber," the court says :   "The term 'timber' as used in commerce, refers generally only to large sticks of wood, squared or capable of being squared for building houses, or vessels ; and certain trees only having been formerly

used for such purposes, namely, the oak, the ash, and the elm, they alone were recognized as timber trees: but the numerous uses to which wood has come to be applied, and the general employment of all kinds of trees for some valuable purpose, has wrought a change in the general acceptation of terms in connection therewith, and we find that Webster defines 'timber' to be 'that sort of wood which is proper for buildings or for tools, utensils, furniture, carriages, fences, ships, and the like.' This would include all sorts of wood from which any useful articles may be made, or which may be used to advantage in any class of manufacture or construction.

"With so many peculiar significations, the intended meaning of the word usually depends upon the connection in which it is used or the character of the party making use of it,— as, for instance, a ship carpenter would understand something quite different when he made use of it from what a cabinet-maker, or last-maker or a carriage builder would,— and the question is, therefore, not what is the popular meaning as understood by any one class, but its meaning as used in the statute, and how the legislators have employed it; and this must be its most general and least-restricted sense, including in such signification what each and all classes would under such circumstances understand 'timber' to be. The language of the section under which this indictment was found mentions particularly live-oak and red-cedar trees, and then speaks of other timber, showing conclusively that it was not the intention of congress to confine the protection intended to any particular class or kind of trees, but to apply it in its most general sense." See also R. S. of U. S. §§ 2317, 2465 and 2466, giving persons planting and protecting timber patents therefor,— a use of the term in its broadest sense.

In *United States* v. *Briggs*, 9 How. 351, an indictment for cutting white-oak and hickory trees on the public lands under act of congress 2 March, 1831, to prevent cutting, destroying or removing live-oak or other timber or trees reserved for naval purposes, prohibiting the cutting of "any live-oak or red-cedar tree or trees or other timber," it was held that the cutting of

oak and hickory trees was prohibited, and the court says: "And so the cutting and using of any other description of timber trees from the public lands would be equally indictable."

In *Nash* v. *Drisco*, 51 Maine, 417, under a permit to "cut and haul all the timber and bark . . . down as small as ten inches at the stump or butt of the trees," the instruction "that the word 'timber' in its etymological sense, might embrace nothing but materials for building or manufacturing purposes," was held correct.

The trend of all the authorities is to construe the word timber, in a statute like the one under consideration, comprehensive enough to work the purposes of the enactment.   The purpose of this statute was to give those using the waters of the state to float the wood-product of our forests, suited for manufacture, to market, equal rights and a convenient remedy under circumstances and conditions, where the common law remedy was inadequate, and compass a result in furtherance of the interests of all concerned.   Drives of logs sometimes unavoidably intermingle, and the expense of separation is simple waste.   Joining drives, by authority of law, makes a saving to somebody in the operation, and this statute fairly apportions the cost of the whole work.   The benefits of it are equally useful whether the drives be of saw-logs, ship-timber, pulp-wood, or any other wood-product suitable for commerce or manufacture that may be conveniently driven to market; and whoever incumbers our rivers with material of this sort for the purpose of floating it to market ought to come within the provisions of the statute, and the legislature must have intended that they should.   It could not have intended the legislation for some classes and not for all. It is remedial and must be most liberally construed when necessary to work out the purpose of the legislation.

II.   The remaining question is principally of fact, best suited for the determination of a jury, but reported in order to determine the legal rules applicable to the assessment of damages.   Floatable streams are public, and should afford equal facilities to all using them under the exigencies of each particular case.   What

would be a reasonable use of one stream might be an unreasonable use of another, and destroy its public utility altogether; so that while some general rules of law may be applied in these cases, no rule of conduct or use can be given that will apply to all cases. If a man wishes the use of a stream, and no other person wants it, he may incumber it with his lumber in a way that could not be permitted for a moment when others at the same time need the use of the same stream. The stream is free to all, and if its capacity for floating logs be inadequate to serve the purposes of all, each one must so conduct as to give the others a reasonable share of its benefits. No man has a right to turn his lumber into a stream and leave it to itself in the way of others. He may turn it in when he pleases, but he must drive it and keep it out of the way of the one following. He cannot land some logs on the ice, turn more in at the first pitch of water, leaving them to make their own way towards market while he shall have cleaned off his operation and made it more convenient for him to make a clean drive, if others, meantime, wish the way clear for their logs. If a man turns a part of his logs into the stream and leaves them to themselves, so that the next drive be embarrassed or hindered by them, he becomes liable at common law for obstructing the common way, or under the statute to pay for driving the same, and it matters not whether such driving be of benefit to him or no. If he chooses to leave part of his logs without care to make their own way, intending to make a clean drive when the balance shall be turned in, and thereby is put to the expense of two drives when, if left the entire use of the river, he need make but one, the result is from his own conduct that has interfered with the equal use of the river to all.

In this case defendants turned some of their pulp-logs into the river in advance of the plaintiffs' drive and left them to make their own way down stream. The plaintiffs came along with a drive of logs that intermixed with defendants' so that separation was costly and vexatious. The plaintiffs drove the whole mass and seek pay for the same under the statute. They are entitled to have it; and it is no defense to say that it was of no benefit

to defendants or that the plaintiffs had still another drive later when all of defendants' logs would have been turned in. The plaintiffs had a right to make two drives or six, and a right to a reasonable use of the river for the purpose. Logs turned into a river are to be driven and are no more to be allowed to scatter along its banks, eddies, rips, falls and meadows, than a flock of sheep, when driven in the highway, can be allowed to scatter and embarrass other drovers, or depasture the herbage of the owner of the fee. Rivers, like highways, are to give passage and not to loiter upon to the annoyance of others wishing to use them.

It is said that the plaintiffs did not make a clean drive of the defendants' logs. They were not required to. They were allowed only to drive such of the defendants' logs at their expense as became intermixed with their own so that they could not be conveniently separated. Such logs they might drive and none others. They could not roll landings, clear eddies, or in any other way interfere with such of defendants' logs as had not interfered with their own. When a log once became intermixed, they might drive that log all the way, even though it afterwards cleared itself from the mass, for once intermixed the the plaintiffs' right of custody attached, and if they assumed to drive it at all, they must drive it home. They could not drive a part of the intermixed logs and scatter the rest along the river, driving only such part as was convenient. That would not be reasonable.

When intermixed logs are once taken charge of to be driven at the expense of the various owners, they must be driven clean,— all driven. The measure of damages would be the pro rata expense of driving the mass. In the present case it is clear enough that the plaintiffs drove clean those logs of the defendants that had become intermixed with their own. They were of a different kind from the plaintiffs' logs. There is much difference of opinion as to the relative cost of driving the two classes — saw-logs and pulp-logs, long logs and short logs — and a jury had better have assessed the damages. They saw the witnesses and felt the spirit of the trial. From cold type it

is hard to arrive at a satisfactory result, but, on the whole, we conclude that an equitable assessment of the damages, apportioning them pro rata as near as possible, would be $2000.

*Defaulted.*